United States Court of Appeals to the Federal Circuit is so pleased to be holding these sessions here this morning. We have two panels in two different courtrooms in this wonderful district court facility here in San Jose. We also want to express our appreciation for all of the helpful arrangements made by the judges and staff of the court, and particularly to thank Judge James Ware for being a part of this panel as well as all of the other proceedings. The list before this panel originally consisted of six cases, two of which have dropped off for various reasons, and two others are being submitted today on the briefs without oral argument. Those are Appeal 2008-3228, RMEO v. Air Force, and Chisholm v. United States, which is Appeal 2008-5089 on the two-case argument list. We'll hear argument first in Appeal 1314 from the present year, Takeda v. Teva. Mr. Dan, good morning to you. Welcome. Thank you, Your Honor. Please proceed. Thank you, Mr. Court. The district court in this case found the elements of inequitable conduct but erred both in fact and law in balancing those elements and in ultimately concluding that there was no inequitable conduct in this case. The district court found that Takeda concealed most of the data that it had comparing Lanzaprazole and its principal prior art comparator, omeprazole. Is there a difference between concealed and disclosed? Concealed seems to sound like an intentional act. Well, we contend that it was an intentional act, Your Honor, and we also contend the district court found that it was an intentional act but found that the evidence of intent wasn't enough to get over what the district court considered insufficiently high materiality. Well, where is the finding of deceptive intent? I didn't see the deceptive content. At page 45 of the slip of page, I think it's page 87 of the record, the district court said, the court recognizes that Takeda's disclosure of the most favorable of its test data to the PTO was self-serving. I think one can fairly read that as serving the interests of obtaining the patent rather than the interests of the system in obtaining full disclosure. It doesn't speak to intent that I can see. But Your Honor, if you go on in the same sentence, it says, but absent any indication that the IMAU data was false, manipulated, the focus of the examiner in any manner, the court declines to find a high level of intent on this record. OK, but declining to find a high level doesn't seem to be the same thing as finding a lower level but still deceptive intent. So I'm having a hard time following you here down this pathway. Because finally, the one thing the sentence I just quoted makes perfectly clear is that the district court made her decision ultimately on the question of balancing. As this court made clear in Judge Michel's opinion in the stroke. You said ultimately. It looked to me like she didn't really make any clear finding as to intent. But move to the second stage, the balancing stage, I read her as saying, in effect, even if I found deceptive intent, it would be just barely over the required threshold and therefore, in view of my finding of low materiality, no way could I find inequitable conduct and render the patent unenforceable. Well, I think, Your Honor, that she did find that we got over the thresholds because I think that was the only way to get to the balancing. But even if you assume. Well, she's innocent. It's like assuming jurisdiction. You say, well, there's a close issue in jurisdiction. But even assuming I have jurisdiction, this case is dismissible because so and so. Well, Your Honor, I disagree with the reading of the opinion. But even if that's right, even if the judge declined to find intent, that finding has to be vacated because of errors in the assessment of materiality. This court has made it clear that one can infer intent from a finding of high materiality, the concealment of high material information that was known to the applicant as to which the applicant knew or should have known. I don't think that's an accurate statement of our law. I thought our law was where the withheld reference is highly material and the withholder knows of the high materiality and third, has no explanation whatsoever that in that limited three-part circumstance, an inference can be made of deceptive intent. But I don't see that we have the three predicates here for that sort of application of the law. Respectfully, Your Honor, I think the court has repeatedly said that if the applicant knew of the high material information and knew or should have known of its materiality, the court said that as recently as a few weeks ago in the Praxair case. I was paraphrasing Praxair. I'm quite aware of Praxair. But I don't see how this is a Praxair case. That's what I'm wanting help on. What it is is a Cargill case, Your Honor. It is a case where the applicant plainly knew of material that I contend was highly material. And I'll turn to that argument in a minute. Plainly knew of that information, the district court found that the applicant should have known of its materiality. And I think the documentary evidence in this case makes it quite clear that they recognized that the materiality. I thought that under Praxair, that the applicant has to have known of the highness of the materiality. And I don't see her so finding that. Respectfully, I think, Your Honor, it is known or should have known that it was material. No, highly material. I think, even if that's the standard, Your Honor, I think it was met in this case. I mean, consider. How so? And more importantly, there's a third problem of the test in Praxair. And that is that there is no credible explanation of the withholding. And I think that's also true here. Let me take the two questions in order. It was perfectly clear from the outset, it was clear that Takeda understood that the key issue of patentability in this prosecution was going to be comparing Lenzaprazole and Omeprazole. Lenzaprazole and Omeprazole are structurally similar compounds that do the same thing. They're both proton-pumped inhibitors. They both inhibit the generation of stomach acid that causes ulcers. The key to patentability, as Takeda recognized, was showing that Lenzaprazole was surprisingly better as a proton-pumped inhibitor than Omeprazole was. In internal documents that were admitted into evidence, Takeda expressed his pessimism that they could get a patent on Lenzaprazole because of its structural similarity with Omeprazole. And so they went into this application knowing that they would have to distinguish Lenzaprazole from Omeprazole. Now, they had a range of data comparing those two documents. Some of the data showed that there wasn't a lot of difference between the two compounds. And then at the other extreme, they had this IMAU data which showed that Lenzaprazole was at least 20 times better, 20 times more potent, than Omeprazole. Aren't you committing the same error that the district judge made in saying that that was the comparison as opposed to all patented compounds compared to other patented compounds? Well, I agree the district court made an error. I hope I'm not making the same one. The district court misread the patent. There's only one data comparing Omeprazole and Lenzaprazole in the patent. And it is data which shows that Lenzaprazole is at least 20 times more potent than Omeprazole. But the patent was much broader than just that one compound. The patent is much broader, but you have to consider the patentability of Lenzaprazole on its own merits. And the examiner had to consider whether there was a separate claim. Indeed, the only claim at issue in this lawsuit is a claim just to Lenzaprazole. It is true that there is a range of data submitted to the patent in the table, in column six of the patent, that compares a number of the claimed compounds to, among other prior compounds, to Omeprazole. But there's only one data comparing Omeprazole with Lenzaprazole, and it is an outlier. It exaggerates what a reasonable scientist would have concluded based on the whole range of the data, were the real differences between Lenzaprazole and Omeprazole, because that was the critical issue for patentability. That's the key to recognize. The data was not just material, as the district court found it was. It was highly material. Well, how do we know what the examiner found critical or not critical? Well, I mean, you say it's critical. I mean, you have somebody say it's not critical. Well, it was critical. But what we really need to know, it seems to me, is what the examiner thought the critical data was. Respectfully, Your Honor, I think that's not the standard. And I think that the court in Cardinal made it clear that it's not the particular examiner. No, no, no. I don't mean subjectively. But an examiner with this application on his desk, what would he have thought would be critical information he or she needs? Well, the critical information was to show that Lenzaprazole, which was structurally similar to prior art compounds and did the same thing, was not obvious in light of them. I mean, the key issue was going to be structural obviousness. And the way to overcome a structural obviousness objection is to show that the claimed compound is surprisingly better, surprisingly superior, and expectedly superior to the prior art compound, which is structurally similar and does the same thing. But structurally similar is a loose term. How similar? You can't divide all compounds into structurally similar and not similar. Because there are degrees of structural similarity. It seems to me that the size of the genus here is a relevant factor on the materiality and the total content of the application, not just that one line on one data chart. Respectfully, Your Honor, I mean, Decatur thought that the structural similarity was going to pose a problem. They described both Lenzaprazole or Meprazole as well as the other compounds claimed in this patent with the same chemical structure formula. I mean, the only thing that differed were a handful of substituents on the same basic structure. Let me ask you this. Do we have to agree with your contention that the finding of only low materiality was clearly erroneous? Do we have to agree with that contention in order for you to prevail on this appeal? I think there are enough errors in the district court's analysis of materiality that, at a minimum, under the Purdue case, you have to remand it. Because, as I suggested, the district court erred in reading the patent, just mischaracterized the patent, and further erred in placing undue emphasis, and this is an error of law, on what the district court concluded was a lack of reliance by this particular examiner. The judge- You have to help me with that. It wasn't clear to me that she did either of the things you accused her of doing. So I think you'd better cite me the exact language that you're relying on in her opinion where she makes the mistake that you didn't characterize in that patent. Page 42 of the appendix, the district court said, at the beginning of paragraph 7, the specification discloses that Lanzaprazole has, quote, superior anti-ulcer action as compared with known compounds by about 1.5 to 20 times or more. That statement is simply wrong. What the patent says is that all of the compounds claimed have superior anti-ulcer action as shown in the table above, which is part of the sentence of the judge. Whoa. And if you look at the whole table, the only- So what? There's a sentence in her opinion that's not fully accurate or not well said in contrast, but that doesn't necessarily constitute reversible error. Judges make mistakes all the time, and it doesn't necessarily lead to reversing a judgment. Because I think here, Your Honor, it was very important. If you read that sentence, Judge Robinson believed that the patent disclosed that there was a range of data pertaining to Lanzaprazole, which showed that it was between 1.5 and 20 times more potent than Omeprazole. And therefore, even though the court found that the data themselves that compared the two compounds was not disclosed, and it should have been disclosed because it was material, it wasn't highly material because the patent, she alerted- Help me understand where you're going here. The one sentence you just read from the beginning of paragraph 70, in her opinion, proves that her whole analysis had to be wrong? It proves that she materially underestimated the importance of the admitted data. I don't see how you get that inference from that sentence. That's where I'm having trouble. Because what that sentence says is that the patentee told the examiner that Lanzaprazole is better and that the data exists in a range from 1.5 to 20, as shown in the above table. So what that says is that the examiner was told that there is a range of data that range from not very different to quite a bit different. The data that was submitted, and that's the only data that's referenced in that sentence because what you don't see in that sentence is the first several words, which is- I'm with you that the sentence isn't accurate, but I'm trying to follow you off the cliff from there, that therefore the whole judgment is reversed because that sentence is inaccurate. Because it allowed her to think that the data that shows that omeprazole was in fact not all that much less potent than Lanzaprazole existed, and they just failed to disclose what it is. OK, and then you say there's a second place where she wrote something that's so serious a misstatement or reflects a serious misunderstanding or something like that, that it by itself also, as a single quote, is grounds for reversal? Well, there are several places of opinion, but the clearest one is the sentence that I quoted earlier. That the focus of the examiner in that- Are we writing now? I'm sorry. I'm on the bottom of A47. The court recognizes that the disclosure of the most favorable test data was self-serving. However, absent any indication that the amount of data was false, manipulated, or the focus of the examiner in any theft, she distinguished the Cargill case. The Cargill case is the closest case. That was another case in which inequitable conduct consisted. How is this statement reversible there? Because that's what I'm having trouble with. I'm trying to follow how you get to your data. Because the district court placed, in determining the critical finding that the district court made, was that the data that was withheld was material but not highly material. She did so in part because, as I suggested a moment ago, she thought that the applicant had disclosed the existence of a range of data but not the data themselves, which was wrong. And that she distinguished the Cargill case on the ground that in that case, the cherry-picked data, if you were, were submitted in response to a rejection. And there was no rejection either. Well, in Cargill, the information was with respect to a critical piece of information. And they were repeating instances. So we don't have either of those circumstances. I think you have at least critical. Because, as I tried to explain earlier, the critical issue of patentability was whether or not there was a surprising difference between lenzomazole and omeprazole. But that's your conclusion. I think that's a conclusion one can draw as a matter of law. And Takeda drew that conclusion. Did you acknowledge that the IMA test, whatever that was, accurately represented? We did not claim that they misstated the data that they had obtained. The point was that that was the only data. And you acknowledged that there were other tests. But the patentee, the applicant, thought that this was the more appropriate. It was the better test. We don't concede that. Indeed, I think, for reasons that I'm not going to have time to get into, but they're explained in a brief. Maybe you will. Hm? Maybe you will. Maybe I will. All right. I'm happy to do it. In every other context, the inventors expressed their views on the comparison between omeprazole and lenzomazole. I'm talking about among the tests. What is your basis for saying that the applicants did not believe that the test that was being submitted was the better test? Because in none of the documentary evidence do the inventors express any preference for that test. I thought Dr. Sato explicitly did say that that was the better of the several tests. Exactly. I think what Dr. Sato said is that they got better results with the INA test. And that's why they included that. Go back to language. Where is it that he says the results were better rather than the test itself was a better way to assess them? I'm reading from page 20 of the plaintiff's, of the appellee's brief. So as I just explained, I'm reading from Dr. Sato's testimony. This model, which is in the endomethedin-antral-ulcer model, was very useful and valuable. So lenzomazole and a series of compounds showed strong activities in this model. So I thought the results from this model were more important as compared to the other test results, such as those of rat acute gastric ulcer model. Well, yeah, but better because they were more reliable or better because they helped on the issue? Better because they helped on the issue. How do you know that? You know that because in every other context in which these inventors compared omeprazole and enzaprazole, they relied and disclosed about all the other data, sometimes not even including the IMAU data. When they went to the management of their company to say, well, wait, wait, wait. You're going off onto something else. I'm just looking at the paragraph you cited by Dr. Sato's testimony as quoted on page 20 of the appellee's brief. And I'm trying to follow your characterization of what he said. And it's certainly true that he starts out saying he talks about results. So I thought the results from this model were more important as compared to other test results. And then he goes on a little bit further. But I don't see why this is inconsistent with the view that he thought the results were better because the test was better. Your Honor, because there's nothing else that suggests that they thought the IMAU data was better. When they submitted an independent new drug application to the FDA, they didn't rely on that data. Is there a testimony in the record that the results of the IMAU data were considered by Decatur in making its commercial decision to go forward with this? They had better submitted a great deal of data to Decatur management to justify the commercialization of this product. It included, but it also included a great deal of other data. And that really gets to the more important point. Even if you assume that the inventors believed that the IMAU data was more persuasive, a better model of the etiology of ulcers in human beings, that doesn't mean that the other. By the way, that was an anti-ulcer model. No, I think that's not correct actually. I think there is other data. I don't think there's any dispute about this, that there is other data from tests specifically denominated as anti-ulcer, which show much smaller disparity between that result and that result. But the more important point, really, Your Honor, is that even if the inventors believed that the IMAU data was more probative, that doesn't mean that the other data was not probative. In every other context in which they explain to their own managers, to the FDA, to the scientific community. Well, how about his testimony? If you're relying on his testimony, and you quote a part of it, it seems like we should look at the rest of what he said to figure out what's the net import of what he's saying. And in the same page 20, he goes on to say, because of these characteristics of the models, the valuable data or the results, and I'm skipping some words, was more valued, and other performances were, there was no need to cite the results of the other models. And maybe I'm being obtuse, but I read that as saying, this was the best test. That's why we wanted to rely on and submit the results of this test versus other tests based on other models. Because they knew that in any fair evaluation, in any other context, scientists rely on a range of test data. When they submitted this to the FDA, they didn't even know. I'm just, I'm just quoting Sato's testimony. You're saying Sato gives me a silver bullet that shows that they had gross deceptive intent. OK, I'm trying to follow that, and you quote some language that does seem consistent with that. But then there's later language which seems to me to point the other way. I'm just trying to understand, does Sato hang them or not? I think Sato hangs them because the following testimony is a lie by their own conduct. In every setting in which they tried to persuade either their management or the Food and Drug Administration or the scientific community as a whole, they relied on a whole range of data, sometimes not including the IMAU data. That indicates that they recognized that the range of data was material. Well, the issues at the FDA on efficacy might be quite different than the issues in the PTO on compatibility. So the fact that different data is relied on doesn't necessarily prove anything about intent that I can see. Counsel, is your main concern that the range is, at the high end of the range? And did you acknowledge that at the low end of the range it's within what the other test data showed? My concern is that they, as in Carter, they cherry-picked data and concealed data that was inconsistent. In other words, in this application, they said, Lanzaprazole is significantly more potent than the principal prior art comparator, omeprazole. Was the chart incorrect? You mean the table in the patent? We don't contend that that data was falsified or inaccurate. It's just incomplete. There's only one data comparing omeprazole and lanzaprazole, and it is an outlier. It's an extreme outlier. How about the other compounds? We make no argument about that because they're not an issue in this case. We've been charged with infringing one claim, which is limited to lanzaprazole. I thought you conceded infringement of that claim. No, no, we have conceded infringement. No, we're only here for the charge. That was the only issue in the case, as far as this patent is concerned. I'm well past my rebuttal. Could I just have at least a couple of minutes? Yeah, we'll give you time for rebuttal. We want to make sure we understand the case. If you've got any more questions, do it. Let's hear from the other side, and we'll make you a full rebuttal. Thank you. Thank you. Mr. Cavanaugh. Thank you, Your Honor. Welcome. Good morning to you. Thank you. Please proceed. Maybe you can pick up from where you left off, rather than starting at the beginning. I think I will, Your Honor. Your Honor, if you go back to page 20, where Counsel Patena took the court, I think Your Honor identified the testimony of Mr. Sato, who was the author of, the developer of the IMAU test, that he thought it was the best model. But I'd also draw your attention down to the next paragraph. Wait a minute. Sure. The second point. The fact that test A is thought to be better than test B doesn't mean that it's OK to withhold test B if it's otherwise relevant. So the fact that he thought the disclosed model, the IMAU model, was better doesn't quite resolve the issue. Because it may have been better, but the other one might have been quite pertinent as well. Well, Your Honor, I think this goes to the question of their intent. And let's see what they did internally. Internally, when they were developing all these different compounds, the evidence shows they went with lenzoprazole over two other compounds, which did quite well on anti-secretory and cyberprotective testing. But they went with lenzoprazole because its results on IMAU were better. They put millions of dollars internally behind that decision. What's your point? My point is, from an intent standpoint, what did they consider to be the best test, the best model, to determine what's the best anti-ulcer compound to develop? Mr. Dinger isn't arguing that the IMAU test is a bad test. He's just saying there were other tests that pointed in the other direction which also should have been disclosed. He's not complaining that that test was disclosed as the bad one. His complaint is the opposite, that other tests weren't but should have been. Your Honor, they made a professional judgment as to go with what they thought was the best test. But let me point out, those other tests are not contradictory. This is not a Cargill case, where one, it was a crucial issue, where there's no indication of that in the record. And in Cargill, you're Are you saying that obviousness was not a crucial issue in this case, in your view? Well, they couldn't even make out a prima facie case in front of Judge Robinson. We tried that issue below. We're talking about what was happening years before in the patent law. It's not what's happening in validity defense in the district court. Your Honor, we don't know precisely what happened in the patent law. No, no, no. Because there was no rejection. Couldn't the reasonable examiner have very serious issue in the case, if not the primary issue? I think structural similarity would have been a critical issue, which is why this doesn't mean that this data, then, was a crucial issue. The examiner may well have found the structural difference was sufficient. You see some activity with the compound, as we say in the specification. But you agree that obviousness would have been a prime issue for any reasonable examiner, not doing this application. I would agree with that, Your Honor. Every examiner is looking at a patent application to see whether it is obvious of the prior. Do you agree with Mr. Dinger that the best way around an obviousness challenge in the mind of the examiner is by showing surprisingly good results? I would agree that's one way to do it. In this case. In this case. That seemed to be the strategy of the applicant. Well, I think we did. I think the applicant did two things. One, it showed that it was structurally different. And then two, it said, and we're getting good results. They went on to say that it's 1.5 to 20 times better. And to follow up on Judge Ware's point, which is, how are we better than the prior art? Only 1.5%. TELA just wants to focus on the 20%. We compared ourselves to Beet Goulden, which was a prior art compound. And we said, it's only 1.5% better. They simply seized on the 20. And it wasn't limited to Lenz-Apersol. It was limited to a range of compounds that are disclosed in that. In that chart or in the scope of the patent? Well, the scope of the claims are broader than Lenz-Apersol. And that chart is not limited to Lenz-Apersol. There are other compounds. But that line in the chart? The 1.5 to 20? Yeah. I believe that would apply to all the compounds and not be limited to Lenz-Apersol. I believe Judge Robinson did misspeak when she said Lenz-Apersol. But if 1.5 to 20 or higher applied to all of the compounds, then it applies to the compound that's the central issue here. That's true. But doesn't then Mr. Digger have somewhat of a point when he points out that many of the tests showed that it was very low in terms of percentage improvement over the prior account? That wouldn't be true. As Judge Robinson found, the test would still fall between the 1.5 to 20. I think there might be one outlier, a dog anti-secretory study, which might be outside. Those were above 1.5. All the others were. When we look internally, I mean, Your Honor, I do think Judge Robinson found no intent here. If you look at the first sentence of paragraph 77, Teva argues that the court should infer intent to deceive in this case. Its factual basis for such a finding, however, is lacking for several reasons. Well, there's a difference between intent to deceive, wouldn't you agree, and intent not to disclose. Was there a decision made by the applicant not to disclose the other test, favoring a better test, but a decision made to withhold? I don't think there's actually any record evidence that they purposefully decided not to disclose. What we know is that it wasn't disclosed. And when Dr. Sato was asked, why did you focus on the IMAU, he testified it was the best test. And then, Your Honor, to take you back to Dr. Maki, who's one of the inventors, calling from page 20 of our brief, Dr. Maki was asked, and his answer was, we think this is the best model to see the action of the human gastric ulcer. Are you contending that the duty to disclose means the duty to disclose the best data? No. I think there is a duty to disclose that which a reasonable examiner would consider important. Wouldn't a reasonable examiner consider all of the data important? I think professional judgment is always going to have to be exercised. Otherwise, you're just going to produce enormous data dumps on the patent office, which will not advance the ability to discern the patentability of it. Wouldn't it be sufficient just to say there are other tests that don't fit these results and move on? At least that would be alerted to the fact that there are other tests. Well, I should point out, Your Honor, in the specification, we do say that other tests were done. But not with negative results. Your Honor, the results weren't negative. Well, they were not the same as the... Well, all but one were within the 1.5 to 20. And again, Kevin wants to focus on the 20. If we're going to make this the issue on which patentability would turn, it's the 1.5 that matters in contrast to B. Goulden. Now, they say, well, Omeprazole was the benchmark compound. There's certainly no evidence of that in the patent record here. B. Goulden showed it was only 1.5. That was a prior art compound. What they rely on, they say, well, internally, there was this great concern about Omeprazole. They referred to an undated, unsourced document. We don't know who authored it or if someone authored an opinion. We don't know who, regarding the potential patentability of Lansoprazole over Omeprazole. But from the patent prosecution history here, all we know is B. Goulden and Omeprazole were cited as the prior art compounds. We were 1.5% better than B. Goulden. And they don't dispute that. They don't dispute the accuracy of the data in there. They don't dispute that internally. Takeda picked Lansoprazole based on its IMAU performance, even when they had other compounds that did better on anti-secretory and cytoprotective. They also raised FDA. The FDA submission, the reason they didn't give IMAU as part of their FDA submission is the benchmark compound was an H2 agonist, ranitidine. You couldn't use the IMAU on ranitidine. So from a regulatory strategy standpoint, you wouldn't want to be relying on the IMAU, which was also a test which the FDA didn't have a lot of familiarity with. So they went with something that could be used against the benchmark compound and which was consistent with what the FDA was used to seeing. Let me take you to another area. Sure. You mentioned the reasonable examiner standard. Although the judge did articulate the standard, the only place in the record that there is a reference to what that means is a reference to what a particular examiner did, the examiner in this case. What's your position with respect to whether or not the trial judge directly applied the proper standard? Well, I think the trial judge did apply the basic. Judge Robinson does cite the reasonable examiner standard and then does walk through the prosecution history here. Because, for example, in cases like this... Cites the standard, but how do we know whether or not it was applied? Well, I think by looking at what is the objective evidence from the patent prosecution history here, was there, as in Cargill and other cases, was there a denial of patentability and then a fight on a particular issue and something became, as they say in Cargill, a crucial issue? Our concern is whether, having stated the correct test, Judge Robinson, in her own mind, applied the correct test. That can't be answered by something extraneous. That can only be hinted at by the text of her opinion. So it seems to me, to answer Judge Ware's question, you've got to point to some of Judge Robinson's verbiage that suggests that she not only could articulate the standard, but applied that same standard in this case. Well, Your Honor, I think in finding low materiality, Judge Robinson walked through what... You do have to look at the particular circumstances of this case and then apply a reasonable examiner standard. I agree with you, she did discuss it in the context of what the examiner did in this case, but I think her finding of low materiality was still based upon a reasonable examiner standard, which is what she stated at the outset was the standard which she would apply. Let me ask you this, as I ask Mr. Ding. Is it critical to your chances to prevail on this appeal that we leave undisturbed Judge Robinson's finding of low materiality? No. Given her finding in paragraph 77 that there was no intent to deceive, which under the recent Starr case, as Your Honor found, as the panel found, you have to start there. And I would also, in referring to Starr's scientific... But that doesn't mean... Sure. Mr. Dinger says, well, yeah, but this is a praxair case, and therefore this is sort of the exception to the general rule that you can't infer bad intent from materiality. So what's the distinction between this and praxair? Well, first of all, praxair tends to deal with... and its progeny deal with prior art. This is a data case, and in data cases, the court has tended to follow the language that's used in Starr scientific...  He says this is just like Cargill. In Cargill, it was a crucial issue. Your Honor, materiality will have a bearing on intent. I agree with that. It has to, as the court has found. If there's a high degree, a very high degree of materiality, they were aware of the high degree of materiality, it would be difficult to produce subjective... to prove subjective good faith. But here, they essentially want to presume intent by virtue of, arguably, high materiality. And as this court said in Starr scientific, you can't do that. Well, was there some explanation going to... Judge Lin's reminder to us that the third prong of the test in praxair also has to be met. Is there some explanation here of why the home office report of other test results was not disclosed? Because there were dozens of different tests. They used the professional judgment that they thought the IMAU was the best test, and that's also... That doesn't quite answer the question. It's one thing to say the IMAU test is the best test, but it's something else to say, and no others are good enough to even include them along with the first test. Well, the question... In other words, if I'm a scientist, and I think tests 2 through 5 stink, then my professional judgment not to disclose them is based on my judgment that they're terrible, and then I would testify to that at the trial. Is there any such testimony here where somebody says, well, those other tests, the ones that we didn't disclose, were so bad and so unreliable it would have just confused the examiner? It wasn't a question of reliability. It was a question of they thought IMAU was the best, and as I've said, internally... Did they act consistently internally? You're not answering my question. My question is, where is there any evidence that they thought the ones they didn't disclose were not good? I don't think there's evidence that they thought they were not good. They didn't think they were particularly important here because they were trying to develop... As the patent says, they were trying to develop an anti-ulcer. These other tests are anti-secretory, cytoprotective, and as I've said, I know a number of times, internally, they decided they had other compounds. But I thought this patent counted four different advantages. They're all interrelated, but four different advantages of the covenant compounds. But it focused on the importance because they were trying to develop an anti-ulcer medication. The prior art was talking about anti-secretory and cytoprotective. They're not all related. They all work hand-in-hand. They do all work hand-in-hand, but at the end of the day, what you're trying to do is prevent the ulcer. And that's why, internally, they had two other compounds that did better than lenzaprazole on anti-secretory and cytoprotective, but they put their money where their mouth was and they ended up investing tens of millions of dollars on lenzaprazole based on the anti-ulcer IMAU test. And it turned out to be the right call. Is it used only as a preventative or is it also used as treatment for ulcers? It's used as treatment, but the way you treat them, it's used for both. And then doesn't that mean that you have to sort of balance the four different types of chemical effect? And if you get great chemical effect on point one in one compound, but it's pretty low on the others, then maybe you cast that one aside in favor of one that's moderately high on all four of them. Well, that's not how they approached it. The way they approached it is they wanted to see, could they develop a compound that at the end of the day reduced and prevented ulcers? And they did. And that's where they put their money, where their mouth was, because they had others that were doing better on other components. I'm not sure I understand why all of that's relevant. The other test showed that the Lansacrasol was two to ten times more and the other test four times more, and that came within the range. Isn't that the point? They all did well, except for this one outlier, a dog anti-secretory study. And there's no evidence that anyone at Takeda was putting great stock in the performance of that one test. All the others came within the 1.5 to the 20. And as Judge Robinson said, okay, fine. Had that been considered, it might have narrowed the range, but it still would have been 1.5 better than B. Goulden. But is the concern that the range was too wide as opposed to coming within the range? Because if you see a range of 1.5 to 20, that means you ought to be able to hit 20. As to, well, with the range of compounds on one of them, you could. But the claim is that the claim did not limit itself to a particular range, did it? No, no. There's no such limitation in any of the claims. This is simply an issue in the specification. There's no issue with respect to the claim. Isn't the correct meaning of the chart in the spec that all of the compounds claimed will fall in the range of improvement over the prior compounds between 1.5 and 20? Between, yes. Yes. I said, then, isn't Judge Ware right in suggesting that the compound in question ought to be able to hit 20, not just 1.5? Well, no. If you say you're between, the way I would read it is all these compounds will come somewhere between those numbers. Anywhere. 1.6 is good enough. Yes. That's how I would read it. I find it very curious that here you have a number of different tests that show different degrees of improvement of glansoprazole over omeprazole. And one side is arguing that because one of the tests is the best test, that's an explanation for why my conduct in disclosing only that one shows I didn't intend to mislead. The other side is saying, well, the fact that you only disclosed the one and didn't disclose the others explains that what you did was misleading. I find it quite curious that the distinction between the data that was disclosed being best is, at the same time, a reason to excuse the failure to disclose on one hand, and on the other hand, is a reason to conclude that there was some intent to mislead. It's curious at best. Well, Your Honor, that's again why I go back to if you look at their internal deliberations, was it consistent with what they did in the Patent Office? And there is a consistency there, which is why there was no, which is why there is no evidence of intent to deceive. And that's what Judge Robinson found in that paragraph 77. They said they've advanced several reasons why you should infer an intent to deceive. Judge Robinson said that fails. They haven't demonstrated intent to deceive. And one of the points she speaks about is the fact that they internally decided this was the best test. It was the basis upon which they distinguished other compounds which were in development. Let's assume that we were to find that there was threshold intent. Does that require us to reverse the holding of no inequitable conduct? Or is it still defensible from your standpoint on the grounds that she was within her range of discretion despite threshold levels of materiality that she found and of intent, as I'm hypothesizing we might find, you could still make a good conclusion? Absolutely, Your Honor. Based upon her finding of low materiality, you would then do a balancing test. Is there a good faith? Let me go to the language that the court used in Praxair. Is there a good faith explanation? I think there is a good faith explanation for what they did. I think there is evidence of a low level of materiality. But she doesn't have any section of her opinion that talks about the balancing test. She does have a section labeled intent and a section labeled materiality, but it's not clear that she actually did the balancing test. Well, I think it is, Your Honor. If you look at the last sentence, it's really taking the last sentence of 77 where she refers to evidence of a high degree of intent. I would infer from that, given the first sentence in paragraph 77, that she found any intent and her finding of low materiality. I think that was the balance. To the extent the court did a balancing test. He does use the word balance in that final clause of the law. That's right. And that's what I would point to. I think that was and the finding of low materiality. That's the balancing test. Let me just clarify Is it the case that the tests were all done by the applicant as opposed to tests that had been done by someone that the applicant was aware of and didn't disclose? In other words, the applicant had done a series of tests showing efficacy in various ranges but only disclosed one of the various tests that had been done or was it that the applicant was aware of tests having been done by others and disclosed them? My belief, Your Honor, is this was all work that internally executed. All right. Well, we've given you both over eight minutes of extra time for your principal arguments in view of the complexity of the case and we'll hear a rebuttal now from Mr. Dinger who has been restored his reserved four minutes. Thank you, Mr. Cavanaugh. Mr. Dinger? Thank you, Your Honor. I'm a producer. To respond to a question that you posed to me, Mr. Cavanaugh, if you find that the judge erred in assessing the materiality of the data that was not disclosed, then I suggest under the Perdue-Endo case, if you conclude that the judge found no intent or if you conclude the judge found intent but balanced it in light of the erroneous finding of low materiality, it at a minimum must go back for a reassessment of intent or the balance in light of the errors regarding materiality. The second point I want to make, I think there is confusion as to what exactly the patent says. I'm referring now to column six of the patent and the table in question. It discloses that, you know, the first several lines of the table include a number of the compounds that are claimed. The second line is Lanzaprazole. The second line from the bottom is Omeprazole. And you see Lanzaprazole is minus one and Lanzaprazole is 20. That is the only data disclosed in the patent comparing Lanzaprazole and Omeprazole. The sentence that appears below the table that says, as shown by the above data, the compounds of this invention have superior anti-ulcer action as compared with known compounds by about 1.5 times to 20 times or more. The only, the 20, the only 20 is the single comparison between Lanzaprazole and Omeprazole. The other figures for, you know, comparing other compounds, the other prior compounds, fit somewhere between 1.5. There's something that is 1.5 and there are a bunch in the middle. But there's only one thing. The right reading of the test is that it asserts that the compound in question hits 20. What I'm saying is that the applicant told the examiner the only thing they told the examiner about Lanzaprazole as compared to Omeprazole was that Lanzaprazole was at least 20 times more potent than Omeprazole. Not that there was other data involving Lanzaprazole and Omeprazole that fall within that range. They say nothing about other data. When I asked Mr. Cavanaugh where it had to fall to be an honest disclosure, he said 1.5. You're saying 20. The only disclosure they made was 20. They had plenty of data that showed a much less significant disparity between Lanzaprazole and Omeprazole. But is the other data showing a different disparity using a similar test? In other words, if the test changes and the data changes, what are we to draw from that as to whether or not that's comparing two things that are the same? In other words, this test produces a result based on the parameters of the test. The reason the drug is being patented is because it shows greater anti-ulcer protection. It doesn't matter. It could be 1.5. It could be 20 under a particular set of circumstances. But would it be any less patentable? It might. That would have been up to the examiner. But what the patentee should have done... The best way to answer it is this way. What the patentee should have done is, as the court said in Cargill, under these circumstances where the issue is whether a plain compound is significantly different from a prior compound, a reasonable examiner would certainly want to consider test data that is directly related to an important issue of patentability along with the applicant's interpretation of the data. What they should have done is disclose the same information they disclosed to the FDA, and then explain why they thought the IMAU data was more probative on the superiority of Flansoprazole than any of the other data, but then leave it to the examiner to make the patentability determination. I think we have your thank you very much. I thank both counties for vigorously writing the important data that was pointed out in your advice. Thank you.